IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| EDNA MEA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | 8:09CV42 |
| | ) | |
| V. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM AND ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Edna Mea Williams ("Williams") seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act and for the payment of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the Commissioner's decision will be affirmed.

## I.  PROCEDURAL BACKGROUND

Williams applied for social security disability benefits on September 30, 2005, claiming low back pain and tendonitis of the elbows rendered her disabled and unable to work since December 13, 2004.  Social Security Transcript ("TR") at 156-60, 397, 400-407.  Her application for disability benefits was denied initially on February 2, 2006, (TR 121-24), and upon reconsideration on May 12, 2006.  TR 115-119.

Williams filed a hearing request on July 6, 2006.  TR 113.  A hearing was held before an Administrative Law Judge  ("ALJ") on June 3, 2008, and testimony was received from Williams, and from a vocational expert ("VE") who appeared at the ALJ's request. Williams was represented by counsel at the hearing.  TR 10-78, 125.

The ALJ's adverse decision was issued on June 24, 2008, (TR 79-90), and Williams' request for review by the Appeals Council was denied on January 14, 2009. TR 6-8. Williams' pending complaint for judicial review and reversal of the Commissioner's decision was timely filed on January 29, 2009. Filing No. 1.

## II.   THE ALJ'S DECISION.

The ALJ evaluated Williams' claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920, (TR 82-90), and found:

1.   Williams was born on November 9, 1962, had completed the 9th grade and, at the time of the hearing, was 45 years old. Her past relevant work activity included being a hospital central supply worker, janitor, and nurse's aide.

2.   Williams met the special earnings requirements under Title II of the Social Security Act on December 13, 2004, the date she stated she became unable to work.

3.   Williams had not performed substantial and gainful work activity since December 13, 2004.

4.   Williams has the following medically determinable impairments that have imposed more than slight limitations upon her ability to function: degenerative disc disease of the lumbar spine at L5-S1, obesity, and the residuals of an old ulnar nerve injury involving her non-dominant left upper extremity.

5.   Williams' medically determinable impairments, either singly or collectively, have not revealed the same or equivalent attendant medical

findings as are recited in Appendix 1 to Subpart P of the Social Security Administration's Regulation No.4.

6.      While such impairments have imposed limitations upon her ability to perform basic work-related functions, Williams remains able to occasionally lift/carry items weighing 20 pounds, frequently lift/carry items weighing up to 10 pounds, sit for 6 hours during an 8-hour workday, and stand/walk for 6 hours during an 8-hour workday.  She can occasionally perform postural activities such as bending, climbing stairs, stooping, squatting, kneeling and crawling, but she cannot climb ladders or scaffolds.

7.      Williams' testimony, insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529, 20 CFR 416.929, Social Security Ruling 96-7p, and Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).

8.      In view of her residual functional capacity for maximum sustained work activity, Williams is able to perform her past relevant work as a hospital central supply worker, and as such she cannot be found disabled pursuant to 20 CFR 404.1520(f) and 20 CFR 416.920(f).

9.      Williams is not disabled, as that term is defined under the Social Security Act.

10.     Williams is not entitled to a period of disability or to the payment of disability insurance benefits or supplemental security income benefits under Titles II and XVI of the Social Security Act.

TR 84-90.

-3-

III.   ISSUES RAISED FOR JUDICIAL REVIEW.

Williams claims the Commissioner's decision was incorrect for the following reasons:

1.    The ALJ incorrectly evaluated Williams' subjective complaints of pain and failed to set forth adequate justification for discrediting Williams' testimony;

2.    The ALJ failed to consider all factors impacting Williams' residual functional capacity, including Williams' obesity, her bulging and torn lumbar disc, and her chronic myofascial lumbar strain;

3.    The ALJ failed to afford appropriate weight to the opinion of Williams' examining and treating physicians; and

4.    As a result of improperly discrediting the plaintiffs' subjective complaints, failing to properly defer to the opinions of her treating and examining physicians, and failing to consider all impairments relevant to the disability determination, the ALJ formulated an improper residual functional capacity ("RFC") for Williams, resulting in a denial of benefits unsupported by the record as a whole.

Filing No. 19.

IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

As of June 3, 2008, Williams was forty-five years old, and did not have a high school diploma or a GED.  TR 20.  From July 1985 until December 2004, Williams worked in various nursing home and hospital settings throughout Omaha, Nebraska. TR 171-78.

On May 14, 2004, Williams injured her left forearm when she bumped it against a trapezium while working as a nurse's aide for Alegent Health.  TR 135-139,

-4-

229.   Despite this injury, she continued working at Alegent Health and providing daycare for her grandchildren.  TR 27-29, 31.  Williams was examined by Dr. Jack McCarthy on August 20, 2004 for complaints of left elbow pain dating back to the May 2004 work-related injury.  Upon examination, Dr. McCarthy noted Williams' rotator cuff strength was normal; there were no signs of spasm or radiculopathy; the range of motion in the cervical spine and shoulder were normal; no defects, intraarticular effusion, or crepitus were detected; no instability was demonstrated; and her x-rays were unremarkable.  Dr. McCarthy concluded the plaintiff had a left elbow contusion which was improving and would significantly improve with patience and time.  TR 230-31.  The doctor concluded  Williams was able to do the majority of nurse's aide duties, should wear a tennis elbow strap with a wrist brace if it was helpful, should not lift more than 20 pounds on the left, and should limit any palm-down lifting.  TR 231.

Williams' employment at Alegent Health was terminated in September 2004 because she fell asleep on the job.  TR 27-29, 31.

When Williams saw Dr. McCarthy on October 6, 2004, the doctor noted some improvement and concluded Williams could lift up to 40 pounds with both hands, and 15 pounds with her left hand, and she could expect to return to full duty as a nurse's aide in three weeks.  TR 228.  Williams was next seen by Dr. McCarthy on November 18, 2004.  Although her range of motion was intact over her cervical spine, shoulder and elbow, and no objective findings were noted on examination, Williams continued to complain of pain.  Dr. McCarthy believed the left elbow problem would resolve over time with Neurontin medication and stretching and strengthening exercises, but he scheduled an EMG of the left upper extremity to rule out radial neuritis.  TR 227.

The EMG performed on November 24, 2004 was "completely unremarkable." Dr, McCarthy's record of November 30, 2004 states:

> What she mostly has is tenderness directly over the extensor mobile wad. It is sore. It is not really a sharp pain as much as just significant tenderness such that with pressure over this area with extension of her wrist and long finger she will have deep pain coming down over her forearm. This pain limits her ability to do power grasping or heavy use.

TR 225. Williams' grip and pinch strength test results were substantially less on the left compared to the right due to pain. Surgical intervention was discussed, but Williams was not interested. Dr. McCarthy recommended occasional use of over-the-counter analgesics for pain, and believed Williams could return to work with a permanent restriction of lifting no more than 30 pounds with both arms, and lifting no more than 20 pounds with either her right or left hand. TR 226. Dr. McCarthy diagnosed a ten percent permanent partial impairment to Williams' left upper extremity. TR 140.

During late December 2004, three of Williams' grandchildren, (ages nine, eight, and four at the time of the June 2008 social security hearing), were placed in foster care. TR 19-21, 27-30. Williams applied to be her grandchildren's foster parent. TR 28-29, 133. The two younger grandchildren were placed with Williams in foster care in January 2005. A few months later, the oldest grandchild was placed in Williams' care. Williams has been the foster parent of all three children since no later than early 2005. TR 28-30.

Williams had filed a workers' compensation claim for the left elbow injury, and on December 30, 2004, she received a lump sum settlement on that claim. The settlement document signed by Williams stated:

> Plaintiff has declined and waives any rights to vocational rehabilitation training because she was terminated from her employment with defendant for reasons unrelated to the alleged incident, but she is currently involved in providing day care services earning the same or similar wages.

TR 137.

On December 29, 2004, the day before she received her lump sum settlement, Williams sought treatment from Dr. Virginia Aguila for low back pain which allegedly began on December 13, 2004, when she lifted a resident while working as a nurse's aid at the Millard Good Samaritan Center.  TR 251, 285-87.  Williams did not return to work, and according to her employer, she failed to report the back injury until several months later.  TR 131-133.

Dr. Aguila prescribed physical therapy, which was commenced on January 26, 2005.  TR 251.  Williams rated her back pain as 7 out of 10.  On initial assessment, the physical therapist stated:

> The patient's rehab potential is fair as she was very sensitive to touch and was unable to tolerate even light movement and testing on this date.
>
> The patient did have some limitations in her range of motion and flexibility.  The patient's flexibility limitations appeared to be secondary to pain as an end feel was not noted with the measurements.  The patient's strength was mostly normal and limitations seemed to be secondary to pain as well.  Patient had an apparent right anterior and left posterior pelvic rotation on this date although correction with muscle energy technique was difficult secondary to the pain reports.

TR 252.  The physical therapy plan included two sessions per week for three weeks, or a total of six physical therapy appointments.  Williams was also instructed on how to perform therapeutic exercises for stretching and abdominal stabilization.  TR 253.

When Williams was seen by Dr. Aguila on February 10, 2005, she reported some relief, but stated she was not improving as fast as she expected.  However, Williams had failed to attend all her scheduled physical therapy sessions, having been "seen for only two physical therapy visits on 01/26/05 and 02/06/05."  Williams "had five cancellations between 01/26/05 and her last scheduled visit which was on

02/24/05," and she told the physical therapist she was cancelling the appointments due to pain.  None of her physical therapy goals were met.  TR 248, 281.

On February 21, 2005, Williams filed a disability insurance claim.  TR 376. When Williams saw Dr. Aguila on February 24, 2005, she complained of low back pain, and stated she cancelled her  physical therapy appointments due to a bad cold. She also apparently reported the low back pain was caused by a motor vehicle accident.  TR 278 ("Impression:  -Chronic LBP 2° to MVA").  Williams requested pain medication and stated she was trying to ambulate and lose weight.  TR 277-278. The doctor's report identified "mild" low back pain, and in addition to prescribing pain medications and ordering an MRI, the doctor's plan listed "Keep PT appointments."  TR 278.

Williams called to reschedule physical therapy on March 9, 2005, and was told she needed to contact her physician and obtain a new prescription for physical therapy. TR 248.  The physical therapist "did not hear from [Williams] following that phone call on 03/09/05."  TR 248.   Williams was discharged from physical therapy on March 29, 2005, with no additional therapy to be provided absent a new referral and a re-evaluation.  TR 249.

When Williams was seen by Dr. Aguila on March 17, 2005, for "Middle Lower Back Pain Workmans comp," she reported "mild low back pain," and explained she had not attended her prescribed physical therapy appointments since February 24, 2005 due to the flu.  TR 275-76.  Dr. Aguila's office prescribed an additional six sessions of physical therapy on April 4, 2005.  TR 246.  As of April 11, 2005, Williams had not scheduled her initial physical therapy evaluation, and the therapist's attempt to contact the plaintiff was unsuccessful.  TR 246.

In April 2005, Williams was applying to be an approved foster care and day care provider, which required a medical examination.  On April 13, 2005, Williams

saw Dr. Aguila for completion of her application paperwork.  Williams reported mild
low back pain and only occasional mild left elbow and shoulder pain with associated
numbness in her fingers. Williams' blood pressure was "doing good."  Dr. Aguila
noted Williams was "obese," but physical limitations due to obesity were not
documented by Dr. Aguila, or any of Williams' medical providers.  TR 273-74.
Williams explained her back pain was "much improved" with physical therapy, but
as of that time, Williams had not attended physical therapy since February 24, 2005,
having failed to reinitiate the physical therapy recommended by Dr. Aguila on March
17, 2005.

Since the physical therapy office did not reach Williams on April 11, 2005, it
again called Williams on April 18, 2005 to remind her to begin her prescribed
physical therapy.  TR 246.  Williams attended her initial physical therapy evaluation
on April 19, 2005.  TR 242.  The physical therapy record dated April 19, 2005 states:

> The patient currently rates her pain as a 7/10 and reports that this is
> fairly high.  The patient reports with medication she is able to get her
> pain down to a 3/10.  Patient describes the pain as pins in her back along
> her sacrum.  The patient also describes tingling sensation along the left
> lateral thigh and buttock.  Patient notes that her leg pain originated in
> her buttocks but has progressed to her thigh area.  Patient notes that
> the left sided pain is worse than the right. The patient reports that any type
> of movement appears to increase her pain and that the only thing that
> she is able to use to control her pain is medication, although she does
> use ice.

TR 242.  Although Williams appeared to have good strength bilaterally, she was very
guarded in her movements, hypersensitive to palpation, could not find a comfortable
position, and did not tolerate the supine position for traction.  The physical therapy
evaluation was limited because Williams resisted testing due to complaints of pain.
TR 242.

Between April 19, 2005 and May 10, 2005, Williams was seen for physical therapy five times, but had five cancellations or no shows.  TR 235, 237.  Dr. Aguila's office discontinued physical therapy pending receipt of MRI testing results, (TR 235), and Williams was issued a TENS[1] unit for pain control.

The MRI performed on May 13, 2005 revealed:

Marrow signal from the vertebral bodies appears normal.  There is a decreased signal intensity from the L5-S1 intervertebral disc consistent with disc degeneration and dehydration.  The conus medullaris is in normal position.

The L1-L2 interspace is unremarkable.  L2-L3 appears normal. L3-L4 appears normal.  L4-L.5 is unremarkable.  L5-S1 shows central protrusion of disc material with an annular tear.  This tear is slightly to the right of midline.  No central stenosis is noted.

IMPRESSION:

1.      Degenerative disc disease at L5-S1 with bulging of the annulus and an annular tear present.

2.      The remainder of the lumbar spine is unremarkable.

TR 304.  Williams complained of pain radiating down both legs, more pronounced on the left side.  She was scheduled to see Dr. Vora, a neurosurgeon, in May, but she missed the appointment.  TR 263, 272, 267.

Williams cancelled or failed to attend her physical therapy appointments scheduled for May 17, May 19, and May 25, and was last seen for physical therapy

---

[1]A TENS unit is a transcutaneous electrical nerve stimulation unit.  It "induces muscle relaxation through mild electric currents."  Trenary v. Bowen, 898 F.2d 361, 1362 (8th Cir. 1990).

on May 26, 2005.  At that time, she was instructed to use the TENS unit as needed for pain.  Williams was discharged from physical therapy on June 14, 2005.  TR 235.

Thereafter, Williams was seen at Dr. Aguila's office on a monthly basis.  Her high blood pressure was considered "well controlled" at some appointments, and "uncontrolled" during others.  TR 266, 262.  Neurological consults were scheduled to assess Williams' continued complaints of low back pain, but she was not considered a surgical candidate.  TR 259.  Williams' prescription for Neurontin was increased.  TR 260.  A checkbox form completed on December 12, 2005 for Williams' disability insurance claim stated Williams was totally disabled from working as a nurse's aide or at any other occupation or type of employment, and due to chronic low back pain and lumbar sacral disc disease, she was limited to sedentary work involving only occasional lifting of zero to ten pounds.  TR 363.  Vocational rehabilitation and a formal functional capacity evaluation were recommended.  TR 364.

At the request of the Social Security Administration, Williams was examined by Geoffrey A. Talmon, M.D. on January 14, 2006.  She complained of low back pain, and was unable to sit throughout the entire length of the examination, had difficulty performing examination maneuvers, exhibited marked pain behavior during range of motion testing, stood and walked with a marked antalgic gait, and needed assistance to get up and down from the examination table.  TR 309.  Dr. Talmon concluded Williams has degenerative disc disease and ulnar nerve injury, (TR 312), with significant reports of symptoms that have not improved with conservative therapies.  TR 313.  Based on her subjective symptoms, Dr. Talmon concluded Williams was unable to stand for an extended period of time, sit for extended period of time, or bend, lift, or twist, but she remained able to see, hear, speak, interact with others, and follow directions without difficulty.  Dr. Talmon noted Williams is right-handed, and her elbow injury affected her ability to grasp and hold with only her left hand.   TR 313.

-11-

A Physical Residual Functional Capacity Evaluation was completed by Dr. Arthur A. Weaver on February 20, 2006.  Dr. Weaver concluded Williams could:

--     Occasionally lift and/or carry 10 pounds, and frequently lift and/or carry less than 10 pounds;

--     Stand at least 2 hours in an 8-hour work day;

--     Sit about 6 hours in an 8-hour work day;

--     Push or pull within the weight restrictions assigned without limitation;

--     Occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl,  but must avoid heights;

--     Reach, handle, finger, and sense with her hands without limitations, and had no visual, communication, or environmental limitations (other than avoiding heights).

TR 212-222.  As to Williams' complaints of low back pain, Dr. Weaver explained:.

Claimant alleges disabling LBP due to lifting injury at work.  Overall, the severity of her symptoms appear to be somewhat greater that expected based on medical findings.  MRI showed an annular tear with some disc bulging, however no canal stenosis or foraminal encroachment was identified and neurosurgeon determined this was not a surgical problem.  Although there have been reports of chronic pain, primary care TS has usually found "mild" tenderness with no evidence of atrophy, wasting or significant weakness.   Reflexes have been essentially normal.  By 4/13/05 her back pain had "much improved" and she was applying for a daycare job;   MER does not reflect any subsequent or further injury.  At present, TENS gives "moderate" relief and Neurontin "takes the edge off."   ADLs indicate that, although limited by discomfort, she does some cooking, laundry & cleaning.  She attends church and drives to stores and doctor's appointments.

She also alleges disability due to ulnar nerve damage, but there is no evidence such as NCT's or imaging to support that contention. However, MER does indicate that claimant has occasional elbow tendonitis, but these events are not expected to last 12 months and appear to respond to NSAlDs.

Hypertension appears to be medically controlled on Vasotec and is presently nonsevere.

Based on the available information, claimant appears capable of activity as listed on the RFC.

TR 222.   The explanation provided by Dr. Weaver is fully supported by the records submitted for review by the ALJ.

Williams sought treatment at the Nebraska Medical Center on March 13, 2006 for back pain described as "10 out of 10" most of the time, which radiated down both thighs and legs.  TR 351.  She was taking over-the-counter Motrin.  Dr. Liu, the examining family practice physician, prescribed Lyrica.  He intended to also prescribe physical therapy for a TENS unit, but Williams stated she had tried TENS therapy before with no significant relief.  TR 352.  A  neurological consultation was scheduled.

Williams was seen by Dr. Michael Shevlin at the University Medical Center Neurosurgery Clinic on March 31, 2006.  Williams complained of low back pain radiating down her legs bilaterally.  TR 350.   No treatment was prescribed at that time pending Dr. Shevlin's review of the MRI performed a year earlier at Bergan Mercy.

When seen by Dr. Lui on May 4, 2006, Williams complained of "progressively worsening" low back pain.  Dr. Lui noted the MRI performed a year earlier showed degenerative disc disease at L5-S1 with bulging of the annulus and annular tear, but the lumbar spine was otherwise unremarkable.  He prescribed additional medications

and encouraged Williams to maintain a healthy weight and perform reasonable daily exercise such as walking and swimming. TR 347. Williams was seen by Dr. Lui on June 12, July 3, and August 2, 2006, and began physical therapy July 19, 2006. The Ultram prescribed by Dr. Lui on July 3 took "the edge off" her pain, but Williams was nonetheless discharged from physical therapy on August 11, 2006 due to lack of progress and intolerance of physical activity because of complaints of pain. TR 334-35. In a letter dated October 7, 2006, and written in support of Williams' claim for disability benefits, Dr. Lui stated:

> I have personally seen Ms. Williams 6 times since March 13 2006 when she became a patient to this clinic. I also referred Ms. Williams to Neurosurgery clinic at UNMC. She was found not to be a surgical candidate for her low back pain. Neurosurgery doctors recommended [a] pain specialist clinic evaluation and physical therapy. She was unable to obtain [a] pain specialist evaluation secondary to her financial situation. During each of the clinic encounters I have seen Ms. Williams, she always seems to be in [a] significant amount of pain. The reliability of her physical exam is limited by subjective pain that she is experiencing. According to Ms. Williams, her back pain has been negatively impacting her daily life.

TR 317. There is no evidence Dr. Lui saw Williams again.

Williams was seen by Dr. Gregory Babbe at the University Medical Center on May 18, 2007. She needed forms completed by a physician to obtain student loan forgiveness. She reported having problems with left arm weakness and a "hard time lifting much of anything . . . because she broke her left elbow . . . back in 2004." She also stated she injured her back at work, and then had a car accident on December 12, 2004, resulting in continuous low back pain radiating down her legs. She complained of difficulty sleeping. Naprosyn and Flexeril were prescribed, and the doctor completed Williams' student loan forms, stating Williams had been unable to work due to chronic low back pain since December 12, 2004. TR 322. Dr. Babbe

completed a checklist RFC evaluation form on June 8, 2007, which stated Williams cannot sit, stand, or walk for more than one hour in an eight-hour day; can occasionally lift weights up to fifty pounds, but never weights greater than fifty pounds; can occasionally carry weights up to twenty-five pounds, but never weights over twenty-five pounds; can occasionally bend, climb, reach, squat, crawl, or reach above shoulder level; can perform fine hand manipulation, but is incapable of grasping, pushing, or pulling with either the right or left hand; and cannot push or pull with either leg.  TR 320-21.

When Williams saw Dr. Babbe on August 8, 2007, she was wearing a brace due to "some persistent discomfort consistent with her carpal tunnel" in her left hand. Williams stated she has been speaking with a lawyer about seeking a disability award, had a hearing set, and brought disability paperwork for completion by Dr. Babbe. Fifteen minutes of the examination time consisted of completing disability paperwork.  TR 393.  No medication changes were recommended.

Williams was seen on September 27, 2007 for <u>right</u> arm pain likely due to "some worsening carpal tunnel" due to edema.  TR 390-91.  She returned to Dr. Babbe on October 10, 2007.  Williams stated she was caring for her grandchildren in foster care, is actually looking after them, and needed Health and Human Services forms completed.  Although Williams complained of ongoing back and right arm pain, Dr. Babbe's objective assessment stated Williams was "sitting in no apparent distress," and he assessed her as having "some ongoing radicular arm pain."  Her blood pressure was "very well controlled," and she was reportedly "not having a problem taking care of the kids at all with any of her shoulder discomfort right now." Dr. Babbe never mentioned Williams' low back in his objective findings, assessment, and plan in the October 11, 2007 medical record.

On October 16, 2007, Williams was seen at the Nebraska Medical Center's emergency department.  She claimed she slipped and fell on her tail bone while

walking down some courthouse steps.  TR 385.  The lumbar spine, sacrum, and coccyx x-rays performed revealed bilateral L5-S1 degenerative facet disease, but no significant degenerative changes, and the intervertebral diskettes were within normal limits.  TR 382-83.  She was prescribed Vicodin, Valium, and a sitting donut, and was sent home with her husband.

When seen for followup on December 3, 2007, she complained of significant back and tail bone pain.  She was prescribed Lidocaine patches and given samples.  TR 380.  Dr. Babbe saw Williams on February 13, 2008, for low back pain, a respiratory infection and a refill of her medications.  TR 379.  Williams was again seen on May 5, 2008 for a flare-up of her back pain.  She was told to increase her Elavil before bedtime, her Darvocet and Naprosyn prescriptions were re-filled, and she received information for stretching exercises.  TR 437.

The hearing before the ALJ was held on June 3, 2008.  Williams testified her past job experience primarily included working as a certified nurses aide, but she had also delivered medical supplies as a central supply worker for Methodist Hospital.  TR 45.  Williams confirmed that she was caring for her daughter's children as a foster parent, (TR 46), and was being paid to provide that care.  Although her interrogatory response indicated she could perform some cooking, cleaning, shopping, and driving, (TR 201-203), Williams testified she does not cook, clean, do laundry, shop for clothing or groceries, or do yard work; must takes breaks while washing dishes; and can only drive for, at most, 10 minutes at a time.  TR 56-57, 59.  Williams acknowledged receiving instruction from Dr. Babbe for home exercises, but stated she could not and was not trying to perform those recommended exercises due to pain.  TR 51.

In response to questioning by the ALJ, the VE testified that assuming Williams could perform within the limitations set forth in the RFC evaluation completed by Dr. Weaver, Williams remained able to perform  her past work in central supply for a

hospital.  The VE testified there are 800 such jobs in Nebraska, with 30,000 central supply jobs existing in the nation.  TR 69.

The ALJ's adverse decision was issued on June 24, 2008.  The ALJ concluded Williams had the residual functional capacity set forth in Dr. Weaver's RFC evaluation, Williams remains able to perform her past relevant work as a hospital central supply worker, and she is therefore not disabled and entitled to social security benefits.  TR 89.

On August 21, 2008, Williams' counsel submitted additional medical records, for a period beginning on July 17, 2008 and continuing through August 12, 2008, in support of Williams' request for review by the Appeals Council.  On July 17, 2008, Williams saw Dr. Babbe for complaints of worsening back pain.  The doctor ordered an MRI and continued Williams' Flexeril, Darvocet, and Naprosyn prescriptions.  TR 436.

The MRI performed on July 23, 2008 revealed:

Vertebral bodies of the lumbar spine are normal in stature, alignment and signal intensity.  Intervertebral disc spaces are well maintained. There is no disc herniation.  The spinal cord is normal in size, signal, and overall appearance.  There is no abnormal contrast enhancement. There is mild central canal stenosis noted at L3-4 and L4-5.

L2-3:      Normal

L3-4:      Central canal stenosis, mild.   There is thickened ligamentum flavum.

L4-5:      Mild spinal canal stenosis.   Moderate thickened ligamentum flavum.  Mild bilateral facet joint disease.

L5-S1:    Mild bilateral facet joint disease.

-17-

TR 439.

Williams was seen in the emergency department on July 31, 2008 complaining of severe back pain, but no new injuries.  TR 430-435.  Vicodin was prescribed.  TR 430-435.   She was again seen in the emergency department on August 4, 2008 for a left foot and ankle injury, and exacerbation of her low back injury, which occurred when she slipped on a wet floor.  Vicodin was prescribed and Williams was released. TR 426-429.

On January 14, 2009, the Appeals Council denied  Williams' request for review.  TR 6-8.

## V.  ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed.  Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  Id.  See also, Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  In other words, "a position can be justified even though it is not correct." Pierce v. Underwood, 487 U.S. 552, 566 n. 2 (1988).

      1.      Assessment of Subjective Complaints of Pain.

The ALJ concluded Williams' subjective complaints of pain were not fully credible.  Williams claims the ALJ's credibility determination must be reversed because it was neither supported by the record nor adequately explained in the ALJ's decision.

When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. See, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).  An ALJ who rejects a claimant's complaints of pain as not credible must make an express credibility determination which explains the reasons for discrediting the complaints.  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009).  "The ALJ need not explicitly discuss each factor, however. . . .  It is sufficient if [the ALJ] acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore, 572 F.3d at 524 (internal citations omitted).

The ALJ's decision outlines Williams' history of medical care, and acknowledges Williams has degenerative disc disease of the low back with bulging of the annulus and an annular tear at L5-Sl.  However, as to Williams' low back, the decision notes that except for complaints of tenderness over the lumbar spine on

-19-

palpation, Williams' periodic examinations were essentially normal and unremarkable, with no findings of sensory deficit and no discrepancy or decrease in lower extremity strength.  TR 85.  The ALJ decision notes Williams was, for reasons not explained by her doctor's records, not considered a surgical candidate; Williams' examination by Dr. Lui was considered of limited reliability due to Williams' subjective complaints of pain; Williams cancelled or failed to attend several physical therapy appointments; and she due to complaints of pain, she refused all of the interventions offered.  TR 85-86.

After reviewing the medical records, the ALJ found plaintiff's medically determinable impairments could reasonably be expected to produce some of the symptoms of which Williams complained, but in light of the record as a whole, her complaints were exaggerated and not credible.  The decision explains:

> The Claimant's testimony, insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529, 20 CFR 416.929, Social Security Ruling 96-7p, and Polaski v. Heckler, supra.

> In support of this finding the undersigned notes that, in spite of her allegedly intractable pain, the Claimant is able to care for her five grandchildren.   In fact, in the past she has declined vocational rehabilitation because she was already caring for these children, apparently did not have the time to commit to any type of training program, and was earning a sufficient amount of money  from the State of Nebraska for her child care. . . .  After she injured her back, she was referred to a physical therapist, but failed to keep several appointments that had been scheduled for her.  Accordingly, she has not always been fully compliant with her recommended treatment.  She is able to drive a car, take care of her activities of daily living, and perform various routine household chores.

TR 98.

The ALJ's credibility findings are fully supported by the record.  In particular, the court notes Williams was able to be the foster parent and care for her daughter's three children despite her alleged back and elbow pain.  Since she was able to be a foster parent, she refused any vocational training in her workers' compensation proceedings.  When she needed forms completed for disability insurance coverage or student loan forgiveness, she was unable to work due to complaints of pain.  However, on April 13, 2005, when she needed medical approval to continue foster parenting, her low back was reportedly only mildly tender, she claimed only occasional mild left elbow and shoulder pain, and she described her back pain as "much improved" with physical therapy.  As of April 13, 2005, Williams had not completed her first physical therapy prescription, having been discharged for lack of progress on February 24, 2005, and as of April 13, 2005, she had not made an appointment to begin the physical therapy prescribed on April 4, 2005.  She told her doctor she did not complete physical therapy in January and February 2005 due to a cold or the flu; she told the physical therapist she could not or did not attend due to pain.   She claimed her back pain arose from a work-related accident, but after the worker's compensation court denied her claim for failing to timely report the alleged injury, she told Dr. Babbe it arose from a work accident followed by a car accident.  She also told Dr. Babbe she broke her left elbow, and during the course of her treatment by Dr. Babbe, her complaints, which began to vacillate between the right and left elbow/arm, apparently evolved (without any supporting objective medical testing) into a carpal tunnel diagnosis for which she wore splints.

The ALJ's credibility findings are supported by substantial evidence of record, and her written decision includes an express credibility determination which explains her reasons for finding Williams subjective complaints were not fully credible.   The ALJ's decision will not be reversed for failing to properly evaluate Williams' subjective complaints of pain.

-21-

2.      Failure to adequately consider all factors impacting Williams' RFC.

Williams claims the ALJ did not consider Williams' obesity, her bulging and torn lumbar disc, and her chronic myofascial lumbar strain when assessing functional limitations.  To the contrary, the ALJ found Williams' medical impairments included degenerative disc disease of the lumbar spine at L5-S1 and obesity, (TR85), and in support of this conclusion, she specifically discussed the bulging annulus and annular tear at L5-Sl; paraspinous muscle spasm and trigger points within the paraspinous musculature, particularly in the sacroiliac area of the spine; and the fact that Williams was five feet, two inches tall and 232 pounds. The ALJ found Williams had some physical limitations due to her back injury, albeit not to the extent argued by Williams. Although the ALJ did not specifically describe physical limitations attributable to Williams' excess weight, there were no medical records indicating Williams' obesity impaired her ability to function.  The treating doctors noted she was obese and encouraged her to lose or control her weight, but none of them suggested any additional work-related limitations due to obesity.  Under such circumstances, the ALJ's failure to further discuss obesity as an impairment does not provide grounds for reversal.  See, Forte v. Barnhart, 377 F.3d 892, 896-97 (8th Cir. 2004).

3.      Failing to properly weigh the opinions of Williams' physicians.

Williams claims the ALJ erroneously failed to afford substantial or controlling weight to the opinions of Williams' examining and treating physicians.  "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009).  However, a treating physician's opinion "does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion. . . . An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence."

-22-

Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009) (internal citations omitted);
Medhaug, 578 F.3d at 815.

An ALJ who credits the opinion of a consulting physician over that of a treating physician must explain why the consulting physician's conclusions were considered more persuasive. Factors to be considered in weighing medical opinions from treating sources, nontreating sources, and nonexamining sources include: 1) the examining relationship between the individual and the medical source; 2) the treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination; 3) the degree to which the medical source presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings; 4) how consistent the medical opinion is with the record as a whole; 5) whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and 6) any other factors brought to the ALJ's attention which tend to support or contradict the opinion. SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006).

Williams' treating physicians included Drs. McCarthy, Aguila, Lui, and Babbe. The ALJ explained she did not credit the physical restriction opinions of Dr. McCarthy regarding Williams' left arm and shoulder impairments because Dr. McCarthy had not provided medical care to Williams since November 2004, Williams' condition may have changed since then, and more recent evaluations were available for the ALJ's consideration.

The ALJ's decision explained Williams' treatment with Dr. Aguila began on January 29, 2005, and by mid-February 2005, Williams' low back pain was reportedly "mild," with no associated loss of strength or sensation, (TR 278); continued to be "mild" in March of 2005, (TR 273-76); and was "much improved" by April 13, 2005. TR 273-74. However, during this same period of time, Williams complained of

significant, disabling pain during physical therapy, and an MRI was ordered. Although the MRI revealed degenerative disc disease and a bulging annulus and annular tear at L5-S1, (TR 304), Williams was not scheduled for surgery or further testing.  Physical therapy was still prescribed by Dr. Aguila, but the plaintiff did not fully participate.  TR 235.  Dr. Aguila signed a disability claim form stating Williams was totally disabled from work and could perform only highly sedentary activities, but the doctor also recommended vocational rehabilitation and a formal functional capacity evaluation, thereby indicating the basis of her disability opinion was somewhat limited by the lack of available objective testing results.

Williams saw Dr. Lui at the University Medical Center beginning in March of 2006.  Dr. Lui referred Williams to a neurosurgeon, who apparently decided she was not a surgical candidate.  Dr. Lui saw Williams six times, and during those clinic encounters, Williams "seem[ed] to be in [a] significant amount of pain," and "[a]ccording to Ms. Williams, her back pain has been negatively impacting her daily life."  TR 317.  However, as noted in the ALJ's decision, Dr. Lui also acknowledged the reliability of any physical exams he performed on Williams was limited by Williams' subjective complaints of pain.  TR 317.

Dr. Babbe first met Williams in May 2007, when he completed her student loan forgiveness forms.   On June 8, 2007, when Dr. Babbe saw Williams a second time, he completed an RFC form imposing significant physical restrictions.  TR 320-21. The checklist RFC form completed by Dr. Babbe imposed far greater restrictions than the limitations identified in the physical RFC completed by Dr. Weaver, a consulting doctor.  The ALJ noted, however, that Dr. Babbe's RFC included no explanation for his findings, and Williams' medical records failed to explain how someone physically capable of caring for three children as a foster parent was, at the same time,  incapable of sitting, standing, or walking more than one hour in an eight-hour day.  There is nothing of record indicating Dr. Babbe ever received and reviewed Dr. Aguila's records, or reviewed Dr. Lui's records before forming his RFC opinions.  The ALJ

-24-

considered the reliability of Dr. Babbe's RFC further undermined by his record dated October 11, 2007, when he completed Williams' examination for continued eligibility as a foster parent. Dr. Babbe 's record noted Williams was performing the actual care provided to Williams' three grandchildren, and although Williams was having "some ongoing radicular arm pain," she was "sitting in no apparent distress." Back pain or discomfort was not mentioned Dr. Babbe's assessment and findings within the October 11, 2007 report.

None of the treating physicians' records state the findings seen on Williams' MRI of the low back caused, or can reasonably be expected to cause, the extent of Williams' complaints of pain. In contrast, Dr. Weaver's RFC included a detailed outline of Williams' medical records, and specifically stated the severity of her symptoms was greater than expected based on medical findings.

To summarize, the ALJ's decision explains she did not credit Dr. McCarthy's opinion because it was not current and was perhaps obsolete in light of events that occurred after he ceased treating Williams; the ALJ did not credit the opinions of Dr. Aguila and Dr. Lui because those opinions were based on Williams' subjective complaints of pain, considered not fully credible by the ALJ, and both doctors acknowledged a lack of available objective testing to formulate an opinion; and the ALJ did not credit Dr. Babbe's opinion as undermined by his lack of contact with Williams, his reliance on her subjective complaints, his use of only a checklist RFC form without providing any supporting explanation, and his subsequent record which failed to mention Williams' low back pain in any objective medical assessment and stated Williams can continue to actively provide full-time foster care for three children under the age of nine.

The ALJ's determination to credit Dr. Weaver's RFC evaluation, and disregard the physical limitation opinions of Williams' doctors was explained and fully supported by the record. The ALJ's decision is not subject to reversal for failing to

afford appropriate weight to the opinions of Williams' examining and treating physicians.

    4.    Improper hypothetical question.

Williams argues the ALJ's determination of Williams' residual functional capacity was not supported by the record. She claims that since the testifying VE assumed Williams can work in accordance with the ALJ's unsupported impairment assessment, the VE opinion cannot provide an inadequate basis for denying social security benefits.

The ALJ found Williams' subjective complaints were not fully credible, and the medical assessments of Williams' treating and examining physicians which were based, in large part, on Williams' subjective complaints, were also not fully credible. The ALJ relied, instead, on the RFC completed by Dr. Weaver and included the limitations within that RFC when posing a hypothetical question to the VE. Dr. Weaver's RFC included an explanatory medical record review, fully supported by the records presented to the ALJ, which explained the basis of his opinions.

The ALJ was entitled to rely on the RFC prepared by Dr. Weaver when formulating her hypothetical questions at the hearing. The VE testified that assuming Williams remained able to work in accordance with the impairments set forth in Dr. Weaver's RFC, Williams could perform her past job as a hospital central supply worker. This testimony provided an adequate basis for concluding Williams had failed to show she was disabled from work and entitled to recover social security benefits.

Upon review of the record as a whole, the court finds substantial evidence supporting the ALJ's decision. Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

January 14, 2010.        BY THE COURT:

                                       *Richard G. Kopf*

                                       United States District Judge